

# Missouri Court of Appeals
## Southern District

### In Division

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) |
| | )   No. SD 37559 |
| v. | ) |
| | )   **Filed: February28, 2024** |
| PAVEL SAMSINAK, | ) |
| | ) |
| Appellant. | ) |

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Becky J.W. Borthwick, Judge

**<u>AFFIRMED</u>**

Pavel Samsinak bludgeoned Victim to death in her living room then lit her house on fire. A jury found Samsinak guilty of second-degree murder, second-degree arson, armed criminal action, and felony tampering with physical evidence. On appeal, he challenges two evidentiary rulings, the refusal to give a jury instruction, and the sufficiency of the evidence to support his tampering conviction. We affirm.

## Background

Samsinak is a fit, middle-aged man who stands six feet six inches tall. He owned a vacant lot adjacent to the home of Victim, a 67-year-old woman who shared her home with her two dogs. Victim and Samsinak argued when Samsinak began building a privacy

fence on what Victim considered to be her side of the property line. Samsinak was "yelling" and "very intense;" Victim was "upset" and "swinging her arms."

One evening about two weeks later, sometime between 7:00 and 8:00 p.m., Victim's neighbor thought she heard arguing and Victim screaming for help, but the sounds were faint. The neighbor looked toward Victim's house and saw Samsinak in Victim's living room "with his hands above his head with something in his hands." Samsinak turned and glared at the neighbor through the window. Not seeing Victim, the neighbor thought she must have heard something else and went about her business.

A fire ignited in Victim's house later that evening. The fire marshal later would conclude the fire had been intentionally set. When firefighters arrived shortly after 10:30 p.m., they found Victim's house engulfed in flames and smoke. They retrieved Victim's lifeless body from within the house. Investigators found a burned, sooty, metal baseball bat leaning against some furniture.

The medical examiner ruled Victim's death a homicide, arising from numerous blunt force injuries to her head, face, neck, and spine. Victim also had defensive injuries on her forearms and hands. Several bruises on her body were linear and consistent with being struck by a bat.

When investigators searched Samsinak's phone, they found a video from the security camera at his home. The video shows Samsinak approaching his house at night with blood stains on his shirt and pants.

At trial, a criminalist testified about blood and DNA testing she performed on evidence gathered in this case. Prior to her testimony, the defense offered her report into evidence "for the jurors to have the report as an exhibit so that they can better understand the testimony of [the criminalist] who is being offered as an expert . . . ." The report

2

outlined evidence gathered, tests performed, and results obtained. The State objected on the basis of hearsay, assumption of facts not in evidence, and relevance. The objection was sustained, with the court noting that experts' reports are not just routinely admitted and that the criminalist would be available for examination.

During cross-examination of the criminalist, defense counsel asked, "[W]ithout telling us what happened, can you just tell us how many other items you tested in this time period?" When the State objected, defense counsel clarified, "I have no intention to ask anything other than how many items [the criminalist] tested and that's -- during that time period. That's all I'm asking. I'm not going to ask anything further." The court sustained the State's objection that the total number of tests performed was irrelevant and may be confusing to the jury. Defense counsel submitted the criminalist's lab report in an offer of proof.

During the jury instruction conference, the defense requested and proffered verdict directors on second-degree murder with sudden passion language and voluntary and involuntary manslaughter verdict directors. The defense argued a voluntary manslaughter instruction was necessary because the jury could find Samsinak acted with sudden passion based on evidence Samsinak argued with Victim. The court found Samsinak had not made a showing of sudden passion and accordingly refused the voluntary manslaughter verdict director and second-degree murder verdict director with sudden passion language. The jury was given conventional second-degree murder and involuntary manslaughter verdict directors.

Twenty minutes into deliberations, the jury sent written questions to the court: "Who owned the bat? Was it determined?" The court replied, "The jury will be guided by the evidence as each juror remembers it." Less than 30 minutes later, the jury returned

guilty verdicts on all counts.

## Tampering with Physical Evidence (Point 1)

Samsinak first contends the State did not present sufficient evidence to support the felony charge of tampering with physical evidence. He asserts that none of the State's witnesses "testified that the alteration of the contents of the house by the fire in any way impaired their determination that Mr. Samsinak caused Victim's death by striking her or did so with the requisite intent."

We review to determine whether a rational fact-finder could find each essential element of the crime beyond a reasonable doubt. *State v. Russell*, 656 S.W.3d 265, 282 (Mo.App. 2022). We must accept as true all evidence favorable to the State, including favorable inferences to be drawn from the evidence, and disregard contrary evidence and inferences. *Id.*

The elements of the felony offense of tampering with physical evidence in the context of this case are: (1) the alteration of the contents of Victim's house, (2) with purpose, (3) to impair its availability in an investigation, and this tampering (4) resulted in the impairment or obstruction of a felony prosecution. *See* *id.* Only the fourth element, resulting impairment, is at issue here.

Defense counsel asked the court to dismiss the tampering count at the close of the evidence based on the same argument presented now on appeal. The State responded that the bat, which it postulated to be the murder weapon, was not consumed in the fire but it was charred and the handle was melted such that it could not "be tested for blood and other things."

The bat was highly relevant to Samsinak's murder and armed criminal action charges. The jury wanted more evidence or testimony about the bat, as evidenced by their

4

questions during deliberations. Although no direct testimony established an inability to test the bat, it reasonably could be inferred that alteration of the bat by the fire precluded testing the bat for the presence of Victim's blood, which would tend to show it was the murder weapon, or Samsinak's fingerprints, which would connect him to the bat. With the evidence it had, the State could not argue the baseball bat was in fact the dangerous instrument Samsinak used to kill Victim, only that it was consistent with the object that inflicted deadly, blunt force trauma. Point 1 is denied.

**Jury Instructions (Point 2)**

Samsinak next contends the court erred in refusing to give the jury a second-degree murder verdict director with sudden passion language and a voluntary manslaughter verdict director.

We review *de novo* the decision whether to give a requested jury instruction for a lesser-included offense. **State v. Rice**, 573 S.W.3d 53, 63 (Mo. banc 2019). The jury must be instructed on a lesser-included offense when: "(1) 'a party timely requests the instruction;' (2) 'there is a basis in the evidence for acquitting the defendant of the charged offense;' and (3) 'there is a basis in the evidence for convicting the defendant of the lesser included offense for which the instruction is requested.'" **Id.** at 63-64 (citing **State v. Jackson**, 433 S.W.3d 390, 396 (Mo. banc 2014)); § 556.046.3.[1] For this determination, "[t]he evidence is viewed in the light most favorable to the defendant and, when in doubt, the court should instruct on the lesser-included offense." **Id.** at 63.

Voluntary manslaughter is a lesser-included offense of second-degree murder. **Id.** (citing § 565.025).

---

[1] All statutory references are to RSMo. (2016).

Voluntary manslaughter is defined as causing the death of another person under circumstances that would constitute murder in the second degree, except that the death was caused under the influence of sudden passion arising from adequate cause. To warrant a lesser-included offense instruction on voluntary manslaughter, there must be a basis in the evidence for the jury to find that [the defendant] acted out of sudden passion arising from adequate cause. "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." The provocation must be of a nature calculated to inflame the passions of the ordinary, reasonable, temperate person. There must be a sudden, unexpected encounter or provocation tending to excite the passion beyond control. Adequate cause, meanwhile, is cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control.

*Id.* at 64 (internal citations and punctuation omitted). "The defendant shall have the burden of injecting the issue of influence of sudden passion arising from adequate cause . . . ." Section 565.023.2.

"'Words alone, no matter how opprobrious or insulting, are not sufficient to show adequate provocation.'" ***State v. Deckard***, 18 S.W.3d 495, 500 (Mo.App. 2000) (quoting ***State v. Redmond***, 937 S.W.2d 205, 208 (Mo. banc 1996)). Furthermore, sudden passion must arise from a contemporaneous provocation, not a former provocation after which a defendant's passion had time to cool. *Id.* at 501.

Every case on which Samsinak relies involved some provocation by the victim beyond a verbal argument: victim physically attacked the defendant, victim brandished a weapon, etc. Only two persons were present in Victim's home immediately before and at the time Victim was bludgeoned to death. One is dead, the other invoked his right not to testify and did not present any evidence or testimony in his defense. Samsinak argues the jury could infer that Victim angered Samsinak and physically attacked him, causing him to kill her out of sudden passion, based on the following testimony adduced from the

6

State's witnesses: (1) Victim was known to upset people, (2) Samsinak previously became angry and yelled during a prior argument in which Victim yelled and waved her arms, (3) a neighbor heard arguing coming from Victim's house and saw Samsinak in the house the night Victim was killed, and (4) wounds were found on Victim's forearms and hands.

The State's evidence directly shows or supports inferences that Samsinak and Victim verbally argued prior to and on the night Victim was killed, that she most likely was beaten with a bat, and that she used her hands and arms to try to shield herself from blows. Even when viewed in the light most favorable to the giving of the defense-proffered instruction, it is pure speculation to suggest that Victim provoked the attack. "While we view the evidence in the light most favorable to [Samsinak's] defense, after-the-fact speculation is not evidence, and jury instructions cannot be based on speculative or forced inferences not supported by the evidence introduced at trial." *State v. Greer*, 588 S.W.3d 623, 627 (Mo.App. 2019).

Samsinak failed to carry his burden to inject the issue of sudden passion arising from adequate cause that would support a voluntary manslaughter verdict director or a second-degree murder verdict director with sudden passion language. Point 2 is denied.

### Surveillance Video (Point 3)

In Point 3, Samsinak argues the trial court abused its discretion in admitting the home surveillance video clip into evidence. He does not challenge the authenticity of the video, that he was the person depicted in the video, its relevance, or the like. His argument, raised below and reasserted on appeal, is that the video lacks foundation because it was not time-stamped or dated.

"The trial court is vested with broad discretion in the admission of visual evidence, including photographs and videos." *State v. Griffin*, 670 S.W.3d 105, 112 (Mo.App.

7

2023). We review a trial court's evidentiary rulings for abuse of discretion. *Id.* at 111. An abuse of discretion occurs only when a ruling is clearly against the logic and circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Brandolese*, 601 S.W.3d 519, 533 (Mo. banc 2020).

"The principles governing admission of photographs also apply to videos. One must establish that the video accurately represents what it purports to show and may do so through any witness familiar with the subject matter and competent to testify from personal observation." *State v. McNear*, 343 S.W.3d 703, 705 (Mo.App. 2011). "[A] witness testifying to such matters need not be familiar with the specific circumstances surrounding the creation of the video itself, nor does the witness need to have observed the exact view of the subject matter depicted in the video." *State v. King*, 626 S.W.3d 828, 841 (Mo.App. 2021).

Officers testified that Samsinak had a specific brand of surveillance camera mounted near the front door of his house. The State's forensic expert, who was acquainted with that brand of security camera system, testified that the video clip had been uploaded to that brand's app on Samsinak's phone between September 19 and 22, inclusive, because recordings were saved for only three days and that particular video clip was opened and viewed on Samsinak's phone on September 22 at 10:08 a.m. The same expert testified the video most likely was recorded at night because it was in black and white, while daytime videos would be recorded in color.

Samsinak did not object to the authenticity of the video and the State's witness linked the video to a three-day range that included the night Victim was killed. This was sufficient for the court to admit the video into evidence. "So long as sufficient evidence

justifies the trial court's admission of evidence as authentic, any weaknesses as to the authenticity of the evidence are for the jury to consider." ***Miller v. State***, 636 S.W.3d 197, 205 (Mo.App. 2021) (quoting ***State v. Abdi***, 611 S.W.3d 536, 540 (Mo.App. 2020)). The defense could, and did, argue why the jury should give the video little or no weight.

The trial court did not err in admitting the home surveillance video clip into evidence. Point 3 is denied.

### Criminalist's Report and Testimony (Point 4)

In his final Point, Samsinak claims the trial court erred in refusing to admit the criminalist's reports or to allow the defense to ask the criminalist how many other items she tested. We review this claim of evidentiary error under the same standard as in Point 3: abuse of discretion. ***Griffin***, 670 S.W.3d at 112.

Samsinak's offer of the report was premature. At that point in the trial, there had been testimony about some, but not all, of the evidence gathered by investigators and listed in the report, but nothing about the criminalist, the tests she had performed, the validity of such tests, etc. Defense counsel candidly admitted that some of the items listed in the report "were not part of the evidence that's been presented in terms of chain of custody." Samsinak did not attempt to lay a foundation for the parts of the report not covered in the State's direct examination of the criminalist.

Defense counsel submitted the reports in an offer of proof at the conclusion of the criminalist's testimony, at which time some of the State's prior objections would have been satisfied at least as to some parts of the report. However, the criminalist also testified in the offer of proof that she did not personally collect any of the evidence and the only way she knew what it was or where it came from was what had been written on the label of the evidence bags. Thus, the report still contained hearsay and assumed facts

9

not in evidence. The trial court did not abuse its discretion in refusing to admit the criminalist's report.

As to testimony about the number of tests performed, defense counsel had no response to the State's argument that the issue was irrelevant and may confuse the jury. Even if defense counsel did not ask about the results of those tests, the State was concerned that the jury would wonder what those results were and why they were not addressed by testimony or evidence. In his motion for new trial, Samsinak argues such testimony was relevant to the criminalist's credibility and possible cross-contamination of DNA evidence. Assuming these theories were properly raised below and preserved for appeal, Samsinak does not argue, much less convince us, how testimony about the *number* of tests performed was relevant in any way. His arguments go to the substance or results of the tests, not the number of tests performed. The trial court did not abuse its discretion in denying testimony about the total number of tests the criminalist performed.

Point 4 is denied. Judgment and convictions affirmed.

JACK A. L. GOODMAN, C.J. – OPINION AUTHOR

MARY W. SHEFFIELD, J. – CONCURS

JENNIFER R. GROWCOCK, J. – CONCURS